UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

IMMANUEL BAPTIST CHURCH OF ROGERS,
ARKANSAS, INC.                                              PLAINTIFF

v.                              No. 5:21-cv-05208

BROTHERHOOD MUTUAL INSURANCE
COMPANY                                                     DEFENDANT

**OPINION AND ORDER**

Before the Court are Defendant Brotherhood Mutual Insurance Company's ("Brotherhood") motion for summary judgment (Doc. 31), brief in support (Doc. 32), and statement of facts in support (Doc. 33).  Plaintiff Immanuel Baptist Church of Rogers, Arkansas, Inc. ("Immanuel") has filed a response in opposition (Doc. 36), brief in support of its response (Doc. 37), and response to the statement of facts (Doc. 38).  Brotherhood filed a reply to this response.  (Doc. 41).  Following additional discovery, Immanuel supplemented its response in opposition (Doc. 48) and Brotherhood filed a supplemental reply (Doc. 51).  For the reasons set forth below, Brotherhood's motion will be DENIED.

I.      **Background**

On a motion for summary judgment, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing" summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations omitted).  Accordingly, the Court recounts the facts of this case in the light most favorable to Immanuel.

On October 21, 2019, a tornado damaged Immanuel's church property.  (Doc. 38, p. 1).  Immanuel submitted a claim for the damage to its insurer, Brotherhood, which accepted the claim.  *Id.* at 1–2.  Shortly after the tornado struck, Immanuel appointed a church member named Randall

1

Smith to serve as project manager for the tornado repairs.  (Doc. 38, p. 4).  "In this role, Randy Smith obtained bids from contractors, retained sub-contractors, arranged for inspections of the church by various experts, provided information requested by [Brotherhood], sent pay requests to [Brotherhood], communicated with [Brotherhood's] representatives, updated church members on the progress, sought approval from church members for certain actions, personally paid for and installed remedial measures to limit the damage to the church and reduce [Brotherhood's] payouts, routinely measured humidity and mold levels, took thousands of photos to back up pay requests made to [Brotherhood], prepared slide decks for presentations to [Brotherhood], and more."  *Id.* at 4–5.  Immanuel paid Smith $60 per hour for his services.  *Id.* at 7.  These payments totaled $56,986.12 by the end of February 2020 (just over four months after the tornado), and Brotherhood partially reimbursed Immanuel for these payments in April of 2020.  (Doc. 38-17).

Brotherhood sent an independent adjustor, Jeff Totty, to meet with Smith and Pastor Tom Hatley four days after the tornado.  (Doc. 38-35, p. 1).  Totty reported "widespread damage" to the roof and air-conditioning units, cracks in the mortar between bricks, and water damage to interior paint and drywall.  *Id.* at 2.  Totty also stated that "it appears that there are no defective products involved or any ascribable negligence on the behalf of any third party."  *Id.*  On November 13, 2019, Brotherhood retained Justin Hall and his firm, Hall Engineering (collectively, "Hall"), to inspect the damage.  (Doc. 41-1, p. 15).  By the end of November 2019, Hall had submitted two reports to Brotherhood.  *Id.* at 16.  Those reports concluded that the building's envelope[1] was

---

[1] "The building envelope, which includes the walls, windows, roof, and foundation, forms the primary thermal barrier between the interior and exterior environments. . . . [I]t plays a key role in determining levels of comfort, natural lighting, ventilation, and how much energy is required to heat and cool a building."  *Building Envelope*, UNITED STATES DEPARTMENT OF ENERGY (last visited August 9, 2023), https://betterbuildingssolutioncenter.energy.gov/alliance/technology-solution/building-envelope.

compromised.  *Id.* at 17.  The reports also noted cracking on the interior sheetrock.  *Id.* at 20.  Hall observed that "damages worsen with proximity to the southeast corner."  *Id.* at 17.

The relationship between Immanuel and Brotherhood was rocky almost from the start. Three months after the tornado, "interior damages [we]re changing with every rain" and drywall in the building's gym was contaminated with mold.  (Doc. 38-31, p. 1).  Brotherhood was still gathering estimates for repairs, and Brotherhood's engineers' estimates were markedly lower than those of Totty or Immanuel's contractors.  *Id.*  Brotherhood resolved conflicts in damage assessments by sending in additional inspectors, leading to further delays.  *Id.*; Doc. 38-32; Doc. 31, pp. 25–26.  For example, the church's roof was not replaced until eight months after the tornado.  (Doc. 48-28, p. 7).[2]

An e-mail exchange between Smith, Totty, and Brotherhood employee Reshelle Potter on January 4, 2020, reveals that tensions between Smith and Brotherhood were running high as the new year began.  Brotherhood had delayed approval for new lighting at the front of the church, resulting in a visitor falling and breaking their nose.  (Doc. 31, pp. 26, 38).  Meanwhile, Potter had declared Smith's $60 hourly rate to be too high.  *Id.* at 34.  Smith's correspondence expressed clear disdain for Brotherhood's process, methods, and trustworthiness.  *See id.* at 35–36.  He defended his rate as "a low consulting rate that I charge my family in their firms," stated that he was working many more hours than he billed, blamed Brotherhood's "excessive delays and highly questionable reasons" for the amount of time billed, and contemplated asking Pastor Hatley for permission to bill his actual hours at his commercial rate.  *Id.* at 34.  Smith also "officially declared" certain

---

[2] Brotherhood urges the Court to disregard the exhibits attached to Doc. 48 to the extent that they exceed the scope of the late discovery the Court permitted Immanuel to engage in.  The Court agrees in part and has accordingly considered only the exhibits relating to the topic of late discovery (the origin of Brotherhood's demands that Immanuel fire Smith) and exhibits whose contents or existence were referenced by the parties in earlier filings.

damage to an HVAC unit to be part of Immanuel's claim and demanded prompt review and payment of all future requests for approval. *Id.* at 33, 35. Smith also noted that "[i]t has been 2-1/2 months now and at my last check, I don't think we have received a dime in payment from you." *Id.* at 35.

Other concerning developments arose in early 2020. Both Smith and Hatley developed coughs, which Smith believed were caused by the mold. (Doc. 31, p. 45). In February 2020, a cleaning company found black material in some of Immanuel's air-vent ducts and recommended that they be replaced as a precaution. *Id.* at 49. Large swaths of the building's insulation, displaced by the storm, had not been replaced as of late February. *Id.* at 16, 50. And some masonry blocks began to move out of position, causing Smith to fear for the building's structural integrity and leading Paul Nilles, a Brotherhood claims manager, to contemplate a "major study" of the masonry. *Id.* at 16–17, 50.

In May of 2020, Smith formally requested a structural inspection of the church. *See* Doc. 38-7. Smith and Immanuel were concerned about Brotherhood using Hall's services again in light of damage missed in Hall's previous inspections. (Doc. 31, pp. 16–17; Doc. 38, p. 11). Regardless, Potter arranged for Hall to conduct the structural inspection. (Doc. 38-7). She stated that Immanuel was "welcome" to hire its own engineer, but that Brotherhood would not cover the cost of doing so. *Id.* Ultimately, Immanuel hired Ryan Engineering to conduct a separate inspection. (Doc. 38-9, p. 4).

Hall issued a structural report on June 1, 2020. (Doc. 41-1, p. 21). The report concluded that the steel structure was undamaged and that the frames were neither bent nor damaged. *Id.* It said that some, but "very few," bar joists and purlins were damaged. *Id.* at 22. It noted some

"missing and loose fasteners" in the northwest and southwest[3] corners, but attributed this to misinstallation rather than the storm.  The report blamed the same loose fasteners for pushing the masonry out of alignment.  *Id.*

Ryan Engineering's report, issued on August 14, 2020, painted a very different picture. *See generally* Doc. 38-9.  The Ryan report detailed "several areas of damage" to the steel structure and a "substantial amount" of damage to the roof's structural system.[4]  *Id.* at 6.  Additionally, it noted "bent bracing, broken welds, damaged bolts and screws, bent wall clips, and others."  *Id.* at 4.  Ryan Engineering concluded, based on the damage, that the building had undergone "movement of 6+ inches at the roof.  Damage to the building's envelope would be expected with these large movements."  *Id.* at 17.  Like Hall's initial reports, the Ryan report recommended consulting a building envelope expert, especially as Ryan observed daylight coming through some of the damaged interior areas.  *Id.* at 20.

When Smith brought the Ryan report to Potter's attention, Potter told Smith that Justin Hall would review the Ryan report and determine how much of the damage was related to the tornado claim.  (Doc. 48-10, p. 2).  Hall's evaluation, issued October 30, 2020, was largely dismissive of Ryan's conclusions.  *See generally* Doc. 48-11.  Hall claimed to have observed much of the damage itself and characterized the needed repairs as generally minor and often already in progress.  *Id.* at 1–2.  Hall stated that most of the so-called "tornado damage" was actually construction defects, and that the damage attributable to the tornado was exacerbated by these defects.  *Id.* at 2–3.  Hall disagreed with Ryan's conclusion as to the six-inch building movement,

---

[3] The reader will recall that the southwest corner was the site of the worst storm damage.

[4] The Court gathers that this damage was separate and distinct from the damage to the roof itself, which would have been under repair for two to three months at the time of the inspection. (Doc. 48-28, p. 3).

stating that this conclusion could only be drawn after a plum-bob test (which Ryan had not done) and that "no sheetrock cracking was found to indicate that amount of shifting." *Id.* at 3. Hall agreed with Smith's suggested explanations for how the design of the building might have minimized sheetrock cracking after a six-inch shift, but stated that the sheetrock "would still show some cracks" after such a shift.[5] *Id.* at 6. To the statement that "Clips were deformed and had sheared or missing screws," Hall said: "Yes, we agree that the bypass clips that attach the curtain wall to the building must be replaced/repaired." *Id.* at 5.

Throughout the summer and fall of 2020, using sensors located throughout the church building, Smith determined that indoor humidity levels were elevated, rising and falling with the humidity outdoors. (Doc. 48-28, pp. 7–8). The humidity was generally highest in the administration and classroom areas. *Id.* at 7. The classrooms and offices were located on the south side of the building, notable because the worst tornado damage was to the southwestern corner. (Doc. 38-9, pp. 32–33). Smith believed that the elevated humidity was due to a damaged building envelope. (Doc. 48-28, p. 8).

In the fall of 2020, Brotherhood reviewed Immanuel's Facebook pages "to help see the timeline of their ministry activities and if anything was mentioned about the building damage/repairs." (Doc. 38-29). Brotherhood took notes about posted events and their locations: "Awana at the IBC Go Center," "special guest speaker in the Theater room, breakfast potluck; rooms 209 and 210," "'daily message from the pastors' continues . . . this time it's with the spinning globe as the backdrop (above the Atrium)." *Id.* Brotherhood appears to have only made more specific notes about the content of messages or events under two circumstances. The first was when the speaker mentioned damage or repairs: "youth pastor Chris Cooper shares about

---

[5] The reader will recall that Hall's initial report found that the sheetrock *was* cracked.

multiple spring storms including hail and heavy rains and flooding on the property," "pastor . . . mentions roof is being replaced," "he talks about windows being replaced so they don't fog anymore, walls being replaced, and is excited about new ceilings."  The second was when the event or message could be considered controversial: "church hosts discussion on Creationism with guest speaker," "meeting in the gym area of pastors to talk about 'concerns' about the SBC,"[6] "says the virus is an attempt to 'turn us into a 1-world government,'" "message is about Race being a lie and a myth, a social construct."  *Id.*

On December 9, 2020, Brotherhood sent a company called Nelson Forensics ("Nelson") to inspect the church.  (Doc. 48-28, p. 4).  The scope of the inspection included the HVAC system, the building envelope, suspected mold or fungal growth, and structural repairs already made.  *Id.* Nelson's subsequent report attributed the elevated humidity levels to use of the wrong setting on a particular ventilator unit, VU-1.  (Doc. 48-28, pp. 9, 14).  Nelson opined that the only unrepaired tornado damage was within the building's central rotunda and did not affect the building envelope.  *Id.* at 16.  Nelson concluded that the ongoing moisture distress was limited to the visibly stained ceiling panels and a single reported leak.  *Id.* at 29.  It attributed the moisture stains in part to the incorrect VU-1 settings and in part to openings in the roof during roof repair.  *Id.* at 30, 34.

Nelson gave the building's structure a glowing appraisal.  Per Nelson, the building had "[i]ntact and secure structural connections throughout, with no indication of structural distress."  (Doc. 48-28, p. 21).  Nelson described "[t]ight and intact metal wall panel attachment clips at the location of the roof coping removal, with no indication of permanent movement or deformation," and included some pictures of unbent clips.  *Id.* at 24–26.  Notably, these pictures

---

[6] "Southern Baptist Convention (SBC) is the largest Baptist group in the United States." *Southern Baptist Convention*, ENCYCLOPEDIA BRITTANICA ONLINE, https://www.brittanica.com/topic/Southern-Baptist-Convention.

were either taken from a distance or from a flat angle, making it difficult for a lay viewer to determine exactly how "secure" or "tight" the connection was between a given clip and its beam. In conclusion, Nelson stated that "[e]vidence of leaning, racking, and/or permanent structural deformation of the structure is not evident." *Id.* at 34.

On January 8, 2021, Ryan inspected the north and south walls again. (Doc. 38-9, p. 50). Warm air, presumably from the church interior, flowed freely through the parapet in certain areas. *Id.* The walls showed signs of distress from in-plane racking, included broken sheathing and buckled siding. And of the structural wall clips that Ryan observed, over half were permanently deformed with their fasteners "likely compromised." In a report issued January 19, 2021, Ryan recommended a full inspection and repair of the clips. *Id.* Attached to the report were several images of clips which were clearly "bent" or "detached" to various degrees as a layperson would understand those terms. *Id.* at 52–53. Two are labeled "Wall Clip at Roof Level." *Id.* Brotherhood received this report on February 2, and Totty reported having seen it on February 4. (Doc. 48-2, p. 10).[7]

Immanuel also retained another engineering firm, Intertek, to evaluate the building envelope. (Doc. 48-27, p. 2). After two site visits, a review of photographs taken by Smith, and a review of the other reports, Intertek issued its report on February 5, 2021. *Id.* Intertek observed daylight visible from below the roof and performed a smoke test which demonstrated "severe air

---

[7] During a deposition, it was represented to Brotherhood's outside counsel, Jennifer Gibbs, that Brotherhood received the second Ryan report on February 2 and that Totty noted having received it on February 4. (Doc. 48-2, p. 10). Gibbs stated that she did not "specifically" remember seeing the report in her review of the claims file, and neither Totty's notes nor the file-stamped report are in the record. However, a review of Gibbs' testimony reveals that she was not shy about stating on the record when she could not identify or authenticate a document. *See, e.g.*, Doc. 51-1, pp. 6, 11, 13. Taking all inferences in Immanuel's favor, Gibbs would have spoken up if Immanuel's counsel had misrepresented the date on a document or if the document was not what Immanuel purported it to be.

infiltration." *Id.* at 3–4.  Intertek also referenced "current confirmed mold growth" inside the exterior sheeting and on the insulation.  *Id.* at 4.  After viewing Ryan's pictures of the clips, Intertek agreed that they were bent and that the damage was consistent with racking.  *Id.*  And while Intertek agreed with Nelson that the HVAC systems should be rebalanced, it stated that the first step in correcting the high humidity was to repair the damaged building envelope.  *Id.* at 6.  Intertek's report included pictures, with one showing a bent clip and one showing where the bending of the clips had crimped the exterior sheeting.  *Id.* at 14–15.

On February 10, 2021, Brotherhood employee Angela Mendoza ran a comprehensive background check on Smith.  (Doc. 48-13, p. 2).  Mendoza testified that there were no results of note.  (Doc. 48-14, p. 2).  Although Mendoza could not remember why she ran the background checks, she guessed that the purpose was to determine whether Smith was an Immanuel employee or had any experience as an insurance consultant.  (Doc. 48-26, p. 5).

In the meantime, perhaps in response to the Intertek and second Ryan reports, Brotherhood (through Totty) arranged for a second inspection by Nelson.  (Doc. 48-16, p. 3).  Immanuel (through Smith) then arranged for Intertek and Ryan to be present at the second Nelson inspection.  *Id.* at 1.  In a February 12 e-mail, Smith accused Nelson of "major errors," "neglecting to implement some of the most basic methodology," and "looking for insurance excuses to reduce claim payouts," as Smith alleged Brotherhood had done with the Hall inspection and others.  *Id.* at 1–2.  Smith also demanded that Brotherhood pay for Intertek and Ryan to be present at the second Nelson inspection.  *Id.* at 2.  Finally, Smith expressed his irritation about "Brotherhood delays" holding up the "urgent[ ]" envelope repair.  *Id.*

On February 15, Brotherhood manager Peter Kujak contacted attorney Jennifer Gibbs of Zelle LLP by phone and e-mail.  (Doc. 31, p. 15).  The e-mail forwarded Smith's February 12 e-

mail and some file documents along with the following:

> I thought I'd give you a small taste of the type of person I've been dealing with. Randy Smith is the person at the church who fancies himself the project manager on this, though he has <u>zero</u> construction experience prior to this. *He's not even in church membership* but somehow convinced them he should be in charge of the insurance claim and wants us to pay some hefty consulting fees for his time spent on the claim. I'm wondering if the Appraisal process could help control what is a neverending list of problems and accusations from Randy – I've never seen anything like it. They do have legit damage from the storm at the end of 2019. Basically anyone who disagrees with him will be criticized and dismissed, and I think his life philosophy is, why say in 15 minutes what you can say in a 2-hour presentation.

(Doc. 48-15) (italics added, underline in original).

Gibbs determined that the appraisal process was not a viable way to resolve the claim under the policy or Arkansas law. (Doc. 48-2, pp. 11–12). However, Zelle's research determined that Smith's conduct could constitute either adjusting insurance without a license or the unauthorized practice of law. (Doc. 48-17). A call by a Zelle staff member to the Arkansas Insurance Department's licensing division confirmed that licenses were not granted to "public adjusters," those who work on behalf of the insured. *Id.* at 2. On February 18, Gibbs' partner advised her to proceed on the theory that Smith was an unlawful public adjuster, "[a]ssuming he is not a member of the church." *Id.* at 1. The partner advised Gibbs to send a letter to Immanuel stating that Smith was violating Arkansas law and that Brotherhood would have no further contact with him. *Id.*

On February 19, Kujak e-mailed Totty: "Hey y'all, do I remember correctly Randy Smith is a church member and not on Immanuel's leadership team? Or what is his role? Is he on their membership roster (if they have one)? Do we know why they chose him to rep them in this instance?" (Doc. 48-1, p. 2). Totty replied that Smith had been a member for less than a year at the time of the tornado, was recently retired from an IT job and therefore had time to devote to the project, and was introduced to Totty by the pastor as the project manager and primary contact. *Id.*

On February 20, Kujak responded as follows, with Potter and Nilles copied:

> Thank you all for the reply.  I'm asking because I have an attorney working on a letter to the church leadership. . . . Please keep this confidential but I'm going to be raising the issue of Randy being not legally permitted to "represent" the church in filing and negotiating their claim; or at least that if he is their liaison with us, he cannot legally be compensated for it. . . . My current plan is to have that letter come to them straight from our attorney – and I'll provide each of you a copy.  If they have an attorney contact us in reply I would not be surprised – in fact, I might welcome it.  Then Randy would no longer be legally allowed to speak with us, and I would assert that even the most difficult attorneys I've gone against were no more unreasonable than my friend Randy.  They probably already have 1 or 2 attorneys involved.

(Doc. 48-1, p. 1).  Despite remembering (four days after telling Gibbs otherwise) that Smith was a church member, and despite learning from Totty that Smith had been a member prior to the tornado, Kujak apparently never passed this information along to Gibbs.  At the time Gibbs drafted the letter Kujak discussed, she believed that Smith was not a church member before the tornado.  (Doc. 48-2, pp. 7–8).

Also on February 19, Kujak sent Gibbs the code to access Immanuel's claim file.  (Doc. 48-18).  He also thanked her for her help, stating: "As extreme as Randy's approach has been, a strong response is needed in return."  *Id.*

On February 25, Gibbs sent the first of several letters to Immanuel.  (Doc. 31, pp. 4–6).  At some point before the letter was sent out, Kujak edited it.  (Doc. 48-20, p. 1).  As planned, the letter accused Smith of acting as an unlicensed public adjuster.  (Doc. 31, p. 4).  However, it did not assert that Smith was a nonmember; instead, it stated that "Mr. Smith did not have any position whatsoever within the church, that he was not a member of the board, and did not hold any leadership position within the church."  *Id.*  The letter further accused Smith of the unauthorized practice of law and noted that this offense is subject to criminal prosecution in Arkansas.  *Id.* at 5.  The letter concluded by reminding Immanuel of its duty to cooperate under the insurance policy

and requesting that it appoint a "member of the board or leadership team of Immanuel" as a new point of contact for Brotherhood.  *Id.* at 6.

In an e-mail sent to Totty and Nilles the same day, Kujak said: "Until we get this sorted out, if Randy contacts you, you have to tell him you cannot speak with him based on correspondence sent to he and the pastor today.  That's all you can say and then politely hang up.  Naturally, I'll let you know as soon as we have sorted this out and can continue with the process in a reasonable matter."  (Doc. 38-24, p. 1).

Gibbs and Hatley would go on to exchange several other letters in March.  Hatley clarified Smith's role as a liaison between church leadership and Brotherhood, challenged Smith's designation as a "public adjuster," stated his willingness to cooperate, expressed disappointment with "unnecessary delays [and] faulty assessments," and announced that Smith would stay in his role.  (Doc. 31, pp. 7–8, 12).  Gibbs reiterated her assessment that Smith was acting as a public adjuster, Brotherhood's refusal to pay Smith, and her threat to "address our concerns with the Arkansas Department of Insurance."  *Id.* at 9–10, 13–14.

In mid-March, Kujak suggested that Gibbs specify that a "legally recognized leader" must manage the claim, listing sample criteria such as "paid staff member[,] credentialed (ordained)[,] on [sic] officer of the corporation (board member)."  (Doc. 48-25).  He further stated that "the church only has 2 paid staff members, the Sr Pastor and a youth leader.  As such, I can see why they have a problem with the resources to handle this claim.  I think we proactively address who should actually be representing them."  *Id.*  To Gibbs' suggestion of "please designate an individual who has not engaged in the unauthorized practice of public adjusting as a point of contact," Kujak replied: "Thank you for making me smile today.  I like that.  Perhaps that's all we can do?"  *Id.*  Two days later, Gibbs sent a letter to Hatley requesting just that.  (Doc. 31, p.

12

14).  Despite this, it appears that Smith stayed in his role.  *See* Doc. 38-22.

On April 21, 2021, Nelson issued a supplemental report based on its reinspection of the church.  (Doc. 48-28).  Nelson stated that the clips were "tight and intact" at the north and south parapet walls, with "[n]o deformed framing or connections," and that "[t]he exterior wall panel clips did not exhibit any deformations or loose fasteners along the north or south elevations and were intact and secure."  *Id.* at 50.  The report included several pictures of intact and unbent clips.  *Id.* at 50–51.  Ultimately, Nelson concluded that "the tornado event on the reported date of loss has not compromised the structural integrity of the metal wall panels, wall panel clips, or connections of the steel studs to the superstructure" and "did not cause any permanent lateral deformation (racking) of the superstructure."  *Id.* at 52.

On May 5, Potter wrote in her claim notes that she had spoken with Nilles, who had discussed the Nelson report with Totty.  (Doc. 38-1, p. 18).  Potter stated that both men "agreed with the report as they did not feel there are any damages to the clips."  *Id.* at 18–19.  At some point, however, Totty inspected the structure himself and found many bent clips.  *Id.* at 12, 16.  Totty is unsure whether he had seen the clips before or after his contact with Nilles, but testified that he would have objected to Nilles' conclusion had he known about the clips at the time.  *Id.* at 19.  Because Totty was unclear as to when the inspection had taken place, and because there would have been little reason for Totty to inspect the clips after Brotherhood decided that no clip inspection was needed, the Court infers for purposes of summary judgment that Totty inspected the clips before the decision was made.

On May 19, 2021, Nilles e-mailed Totty and Potter about the new Nelson report.  (Doc. 38-27).  Nilles noted that "Nelson has inspected perimeter metal wall clips at the most elevated locations of the structure.  This is important as these clips would have sustained the most intense

air pressure from the tornado. Their inspection did not reveal loose or distorted clips; thereby suggesting that the metal structure has not sustained tornado wind damage." *Id.* He also noted that damage to the metal panels was attributed to factors other than the tornado because the clips were not affected. Nilles concluded that "[g]iven Nelson Engineering's position I do not see any additional damage to the metal structure that would change the current scope of loss or estimate of damages." He told Totty and Potter to contact him if they had questions. *Id.* There is no indication that Totty objected.

On July 15, 2021, a meeting and joint inspection of the church took place. (Doc. 38-22, p. 1). At the meeting, Smith announced that he had manipulated the settings of VU-1 to prove that the church's elevated humidity was caused by outside air intrusion, not the HVAC settings. *Id.* at 1–2; *see also* Doc. 48-29. Unbeknownst to Smith, Nilles (who was present at the meeting) recorded Smith's presentation and sent it to Potter, who told him to send it directly to Gibbs. (Doc. 48-2, pp. 16–17; Doc. 48-30). On September 15, Gibbs sent a fourth letter to Hatley. (Doc. 38-22). Besides the changed settings, Gibbs took Smith to task for:

> "mak[ing] assertions about the scope and extent of alleged damages to the property, including . . . an assertion that there is an opening in the envelope of the HVAC unit that has not been fixed resulting in the growth of mold . . . . continu[ing] to forward baseless accusations against Brotherhood Mutual and its consultants . . . . Smith also stated that Brotherhood Mutual's concerns with his unauthorized practice as a public adjuster was 'one more way to delay moving forward on the claim.'"

*Id.* at 2. Gibbs stated that, besides Smith facing legal peril, Immanuel's policy could be voided for fraud or failure to cooperate based on Smith's behavior. *Id.* at 2–3. Finally, Gibbs claimed that Brotherhood had not received "an engineering report from Ryan Engineering" despite having requested it on several occasions. *Id.* at 3.

On November 22, 2021, Immanuel filed the instant suit.

## II.   Legal Standards

### a.   Summary Judgment

On a motion for summary judgment, the Court views the record in the light most favorable to the nonmoving party, grants all reasonable factual inferences in the nonmovant's favor, and only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a); *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016). The nonmovant may not rely only on allegations in the pleadings but must identify specific and supported facts that will raise a genuine and material issue for trial. *Ryan v. Cap. Contractors, Inc.*, 679 F.3d 772, 776 (8th Cir. 2012) (quoting *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1393 (8th Cir. 1997)). Facts are material when they can "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes are genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "While the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Haggenmiller*, 837 F.3d at 884 (quotations omitted).

### b.   Bad Faith

In Arkansas,

[t]he standard for establishing a claim for bad faith is rigorous and difficult to satisfy. *Delta Rice Mill, Inc. v. General Foods Corp.,* 763 F.2d 1001 (8th Cir.1985). In order to state a claim for bad faith, one must allege that the defendant insurance company engaged in affirmative misconduct that was dishonest, malicious, or oppressive. *State Auto Prop. & Cas. Ins. Co. v. Swaim,* 338 Ark. 49, 991 S.W.2d 555 (1999); *Aetna Cas. & Sur. Co. v. Broadway Arms Corp.,* 281 Ark. 128, 664 S.W.2d 463 (1983). This court has defined "bad faith" as "dishonest, malicious, or oppressive conduct carried out with a state of mind characterized by hatred, ill will,

or a spirit of revenge." *Swaim, supra.*

*Unum Life Ins. Co. of Am. v. Edwards*, 210 S.W.3d 84, 87 (Ark. 2005).

Within this single excerpt, two conflicting formulations of the standard emerge.  As formulated by the *Unum* court, the elements of bad faith would seem to be (1) affirmative misconduct (2) that was dishonest, malicious, or oppressive.  But as formulated by the *Swaim* court and quoted by the *Unum* court, the elements are (1) dishonest, malicious, or oppressive conduct (2) carried out with a state of mind characterized by hatred, ill will, or a spirit of revenge.  The *Unum* formulation raises the question of what constitutes "affirmative misconduct" separate from dishonesty, malice, or oppression; the *Swaim* formulation seems to collapse the two *Unum* elements while adding its own mens rea requirement.  Similar tensions are evident in other descriptions of the cause of action: the Arkansas Supreme Court has alternatively said that the requisite motive is "to avoid a just obligation to [the] insured," *Swaim*, 991 S.W.2d at 559, and "to avoid the insurer's liability under an insurance policy," *Reynolds v. Shelter Mut. Ins. Co.*, 852 S.W.2d 799, 801 (Ark. 1993).

For clarity, this Court turns to the Arkansas Model Jury Instructions.  "The Arkansas Model Jury Instructions are expressly adopted by the Arkansas Supreme Court, and thus the content of the relevant Instruction would be a good indicator of how the Arkansas Supreme Court views the overall doctrine."  *Porter v. Hendrix*, 2023 WL 4706193, at *15 (E.D. Ark. July 24, 2023).  Per Model Instruction 2304:

> [Plaintiff] has the burden of proving each of three essential propositions:
> > First, that [Plaintiff] sustained damages;
> > Second, that (defendant) acted in bad faith in an attempt to avoid liability under its policy issued to (plaintiff);
> > And third, that such conduct proximately caused damage to (plaintiff).
> "Bad faith" is not the mere failure or refusal to pay a claim. "Bad faith" requires affirmative misconduct, without a good faith defense. The affirmative misconduct must be dishonest, oppressive, or carried out with a state of mind

16

characterized by hatred, ill will, or a spirit of revenge.

Ark. Model Jury Instr., Civil AMI 2304.  The comment to the instruction clarifies that "hatred, ill will, or a spirit of revenge" is not a separate mens rea requirement, but rather the Arkansas definition of "actual malice" which has been substituted for the term "malicious" "for the sake of simplification and juror comprehension." *Id.*  By implication, dishonest or oppressive misconduct need not be motivated by hatred, ill will, or a spirit of revenge to constitute bad faith; it need only be dishonest or oppressive.

This jury instruction does not clarify the extent to which "affirmative misconduct" requires a showing of something more than dishonesty, oppression, or malice.  However, Arkansas case law indicates that the "affirmative misconduct" requirement is meant to separate nonperformance from defective performance, not to require a separate showing that dishonest, oppressive, or malicious conduct rises to the level of "misconduct."  *Unum*, 210 S.W.3d at 88 ("The tort of bad faith does not arise from a mere denial of a claim; there must be affirmative misconduct. . . . '[A]n action in tort cannot ordinarily be based upon a breach of contract which amounts to mere nonfeasance, which means not doing the thing at all, as distinguished from misfeasance, which means doing it improperly.'") (quoting *Findley v. Time Ins. Co.*, 573 S.W.3d 908, 911 (Ark. 1978)).

Arkansas courts and the Eighth Circuit have recognized that ignoring evidence can constitute bad faith under Arkansas law.  *Cincinnati Life Ins. Co. v. Mickles*, 148 S.W.3d 768, 777–78 (Ark. Ct. App. 2004); *Sims v. State Farm Mut. Auto. Ins. Co.*, 894 F.3d 941, 945 (8th Cir. 2018) (citing *Mickles*); *Bryant v. State Farm Fire & Cas. Co.*, 2013 WL 1445482, at *5 (E.D. Ark. April 9, 2013) (citing *Mickles*).  Ignoring evidence is distinct from conducting a negligent investigation or failing to investigate, neither of which rises to the level of bad faith without a

17

showing of malice. *Sims*, 894 F.3d at 945. Ignoring evidence is also distinct from underweighing evidence, which is a form of negligent investigation. *Id.* These distinctions are easier to draw given the affirmative-misconduct element; ignoring evidence must be a deliberate choice, not the result of an oversight or bad judgment, to constitute bad faith. *See Mickles*, 148 S.W.3d at 778 (insurer "*made a decision* to ignore evidence") (emphasis added); *Bryant*, 2013 WL 1445482 at *5 (on summary judgment, "reasonable minds might conclude that State farm *made a decision* to ignore evidence") (emphasis added). From there, although no Arkansas court has taken this analytical step, the knowing omission of material facts from an insurer's analysis can be classified as a form of dishonesty for purposes of the "dishonest, oppressive, or malicious" requirement.

With the operative standard thus clarified, the Court will turn to the instant case.

### III.   Analysis

#### a.   Smith

Brotherhood argues that its actions in refusing to deal with Smith cannot constitute bad faith because Smith was operating illegally as an unlicensed public adjuster. While the accusation is not meritless, there is nonetheless sufficient evidence on summary judgment to raise a question of fact as to Brotherhood's bad faith.

"An 'adjuster' is an individual, firm, limited liability company, or corporation who for compensation as an independent contractor or as the employee of an independent contractor or for fee or commission investigates and negotiates, on behalf of the insurer, settlement of claims arising under insurance contracts." Ark. Code Ann. § 23-64-102(4)(A). "Unless he or she has complied with the Producer Licensing Model Act, § 23-64-501 *et seq.*, a person shall not consult, counsel, or advise others on matters of insurance needs or coverages under any insurance policy or contract of insurance unless licensed under this section. Licensure of a salaried employee of the entity or

entities for which he or she may consult or counsel on matters of insurance to that entity or entities shall not be required.  No person may adjust claims as an adjuster without licensure under this chapter."  Ark. Code Ann. § 23-64-201(b)–(c).

> Brotherhood argues that Smith's conduct fits within Arkansas' definition of an adjuster:
>
> Throughout this process, Mr. Smith daily acted as a paid consultant on behalf of the insured, regularly consulting, negotiating and advising the church on all matters related to this insurance – including the soliciting [sic] bids, the hiring (and firing) of various independent contractors, and even disputing coverage decisions made by Brotherhood based upon its own interpretation of the policy issued to the plaintiff.

(Doc. 32, p. 5).  Brotherhood also points to guidance from the Arkansas Insurance Department stating that "[p]ublic adjusters are prohibited from adjusting claims in Arkansas."  (Doc. 31, p. 79).  Per the National Association of Insurance Commissioners' State Licensing Handbook, public adjusters are adjusters who contract with and represent the insured.  (Doc. 31, p. 73).  And at least one Zelle employee was apparently told by Arkansas licensing authorities that Arkansas did not license public adjusters.  (Doc. 48-17, p. 2).

Immanuel resists this characterization.  It claims that Smith qualifies as an "insured" under the policy because he is a member of Immanuel, the named insured.  (Doc. 38-30, p. 5).  Alternatively, Immanuel claims that Smith's activities were a "Related Organization/Operation" also covered by the policy.  *Id.*  An insured acting on the insured's own behalf, Immanuel argues, is within its rights to negotiate the claim and cannot be frozen out of such negotiations.

The Court presently does not need to, and therefore declines to, determine which party is correct as a matter of Arkansas law.  However, the Court finds that Brotherhood's position is a legally reasonable one which could be held in good faith.  Smith's activities arguably overlap with the statutory definition of "adjusting," and his status as an independent contractor for Immanuel demonstrates that he was compensated on a non-salary basis and casts doubt on whether he was

acting in his capacity as a member.  Further, it was arguably reasonable for Brotherhood to rely on the Arkansas Insurance Division website and Zelle's phone call with the licensing department to determine that public adjusting was illegal in Arkansas.  Accordingly, the mere fact that Brotherhood has taken this legal position does not establish Brotherhood's bad faith.

The Court's inquiry does not end there, however.  The Arkansas Supreme Court has recognized that the threat of litigation can be a form of misconduct:

> [Threats of litigation are] ordinarily unprivileged if the actor has no belief in the merit of the litigation or if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not be [sic] bring his claim to definitive adjudication.

*Leek v. Brasfield*, 290 S.W.2d 632, 633 (Ark. 1956) (quoting Rest. Torts, § 767, Comment b).  The Restatement explains that this holds especially true for "[c]ausing or threatening to cause, in bad faith, the institution of a criminal proceeding . . . ."  Rest. Torts, § 767, Comment b.

Here, construing all facts in Immanuel's favor, a jury could conclude that Brotherhood's threats[8] were made in bad faith.  The fact that Smith's allegedly illegal behavior was never reported to the authorities indicates that Brotherhood, even if it believed there were grounds to report Smith, never intended to "bring [its] claim to definitive adjudication."  Rather, the threat of a report seems to have been used as a bargaining chip to alarm (or, less charitably, "harass") Immanuel into parting ways with Smith.

Brotherhood contends that its actions towards Smith are irrelevant because it never

---

[8] Brotherhood says that "Ms. Gibbs in no way 'threatened criminal prosecution' but, instead, simply cited to Ark. Code Ann. § 16-22-501 for the proposition that '*If* a person is found to have committed an offense under the aforementioned statute, *they may* be subject to criminal prosecution.'"  (Doc. 51, p. 11).  Taken in the light most favorable to Immanuel, however, this is a thinly-veiled threat.  In any event, Gibbs made a less ambiguous threat of legal trouble elsewhere: "If, however, Mr. Smith continues to act as a public adjuster, we will have no choice but to address our concerns with the Arkansas Department of Insurance."  (Doc. 31, p. 10).

20

demonstrated bad faith towards Immanuel, the plaintiff.  Viewing the facts in the light most favorable to Immanuel, however, a reasonable jury could find that Brotherhood's interference with Smith was carried out to oppress Immanuel with the goal of avoiding liability under the policy.

It appears from the record that Smith was integral to Immanuel's recovery efforts.  Kujak stated in an e-mail to Gibbs that Immanuel was short-staffed, having only two paid employees, and that he could "see why they have a problem with the resources to handle this claim." Nevertheless, in the same e-mail, Kujak wanted to require that only an ordained clergyperson, one of the two paid staff members, or a member of the (all-volunteer) board be able to liaise with Brotherhood.  When Gibbs suggested broader criteria, Kujak's response was "Perhaps that's all we can do?", indicating that he would have further limited Immanuel's options if possible. Brotherhood knew that the damage was complex and ongoing.  An unpaid volunteer or someone with another job would be unable or unwilling to devote as much time to the repair project as Smith did, and Kujak initially wanted to limit Smith's potential replacements to such people.  Even under Gibbs' suggestion, and even if Smith was replaced with another congregant with unlimited time to devote to the project, Immanuel would lose the benefit of Smith's exhaustive knowledge of the damage and repairs.  Indeed, Brotherhood (through Gibbs) explicitly took issue with Smith's "mak[ing] assertions about the scope and extent of alleged damages to the property, including . . . an assertion that there is an opening in the envelope of the HVAC unit that has not been fixed resulting in the growth of mold."  Immanuel would also lose the negotiation benefits of Smith's tenacity, which appears to have been a major sticking point for Kujak, who griped about the "never[-]ending stream of problems and accusations" Smith raised and stated that he "might welcome" a lawyer's involvement because "even the most difficult attorneys I've gone against were no more unreasonable than my friend Randy."  Accordingly, a jury could find that

Brotherhood's conduct regarding Smith was oppressive to Immanuel and was carried out with the aim of avoiding the full extent of Brotherhood's obligations.

Finally, Brotherhood falls back on Gibbs' advice, stating that she was never tasked with any specific instructions as to Smith and was steadfast in her legal conclusion.  As to the first point, Kujak made his feelings about Smith very clear in his correspondence with Gibbs.  Brotherhood's animus towards Smith was evident in Kujak's initial e-mail to Gibbs, which was largely a rant about Smith's behavior.  And Kujak's February 19 message to Gibbs, stating that "[a]s extreme as Randy's approach has been, a strong response is needed in return," can certainly be read as encouragement to proceed aggressively against Smith.

Even assuming that Gibbs stands by her legal position in good faith, however, her good faith does not transfer to Brotherhood.  It is true that "[a]cting upon the advice of counsel is a defense to a charge of malicious prosecution."  *Family Dollar Trucking, Inc. v. Huff*, 474 S.W.3d 100, 104–05 (Ark. Ct. App. 2015).  However, this is a case for bad faith, not malicious prosecution.  And even in the context of malicious prosecution, "to avail itself of the [advice-of-counsel] defense, [Brotherhood] must have made a full, fair, and truthful disclosure of all facts known to it and acted in good faith on counsel's advice."  *Family Dollar*, 474 S.W.3d at 105.  In other words, even where the advice-of-counsel defense applies, it does not shield a client who acted on the advice in bad faith.  Further, taking the evidence in the light most favorable to Immanuel, Kujak failed to make a "full, fair, and truthful disclosure of all facts known" to Brotherhood or even to his own self.  While Kujak represented to Gibbs that Smith was not in church membership, he reached out to Totty and Potter only a few days later and asked if them to confirm *Kujak's recollection* that Smith *was* a church member.  The inference can be drawn that Kujak knew at the time of his writing to Gibbs that Smith was a church member but lied to Gibbs in the hope that she

would reach a legal conclusion unfavorable to Smith and, by extension, to Immanuel.  Therefore, even if reliance on Gibbs' advice was a defense (which it does not appear to be in this context), it would not be available to Brotherhood.

Because a jury could find that Brotherhood acted in bad faith in its conduct towards Smith, summary judgment for Brotherhood is improper.

b.  Clips

A second, independent ground exists for denying summary judgment here: Brotherhood's handling of the bent-clip question.  Brotherhood's determination that no clips were bent was central to its determination that the metal structure required no further repair.  However, construing all facts in Immanuel's favor, a jury could find that Brotherhood reached this conclusion by deliberately ignoring objective evidence of bent clips.

Brotherhood asserts that Immanuel cannot defeat summary judgment on this ground because it did not raise the bent-clip theory of bad faith in its complaint.  However, "the formal issues framed by the pleadings are not controlling on a motion for summary judgment; the court must consider the issues presented by the other materials . . . to determine whether the Rule 56 request should be granted."  10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2727 (4th ed. 2023) (collecting cases).

Taking all inferences in the light most favorable to Immanuel, Brotherhood possessed the second Ryan report, which contained pictures of bent clips.  Brotherhood also knew through Totty, who had seen the bent clips, that some clips were bent.  Further, a jury could certainly find it significant that Brotherhood sent Nelson back to inspect the clips only after the Intertek and second Ryan reports, which detailed the bent clips, were released.  A jury could infer that Brotherhood was reacting to the reports, indicating that it had seen them and the pictures in them.  And

23

Brotherhood does not dispute that it possessed Ryan's first report and Hall's rebuttal, which confirm that there were damaged clips (although without the benefit of photographic evidence). Despite this, Brotherhood refused to pay for further inspection and repair of the metal structure based on the premise that no clips were bent, a premise which a jury could conclude Brotherhood knew to be false.

This is not, as Brotherhood claims, a case of simply underweighing evidence. At least to the Court's untrained eye, the pictures in the Intertek and second Ryan reports clearly show bent clips, and Totty, who was part of the decision at issue, unambiguously testified that he saw bent clips. A clip cannot be simultaneously bent and unbent. If some clips were bent, it cannot be true that no clips were bent. If Brotherhood knew that some clips were bent, it could not believe in good faith that no clips were bent. Accordingly, a jury could find that Brotherhood chose to ignore the bent clips to avoid paying for needed repairs.

Because a reasonable jury could conclude on this record that Brotherhood acted in bad faith, summary judgment is not appropriate.[9]

## IV.  Conclusion

IT IS THEREFORE ORDERED that Defendant's motion for summary judgment (Doc. 31) is DENIED. Plaintiff's claims remain pending for trial.

IT IS SO ORDERED this 23rd day of August, 2023.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE

_____

[9] Immanuel also cites payment and repair delays, the monitoring of sermon content, and Justin Hall's lack of structural engineering qualifications as evidence of bad faith. Because the evidence already discussed is sufficient to defeat summary judgment, the Court will not address the legal relevance of this evidence absent a motion in limine.